

Smith Lee Nebenzahl

October 26, 2012

The Honorable Lois H. Goodman
United States District Court
District of New Jersey
402 East State Street
Room 2020
Trenton, NJ 08608

**RE:    Moss v. Cooper Tire & Rubber Co.**
       **Civil Action #: 3:11-cv- 00689**

       In accordance with your honor's order when the parties were before you on September

18, 2012, I have submitted a letter dated October 3, 2012 to counsel for the defendants in an

effort to clarify the Plaintiff's Request For Production of Documents        and to provide

appropriate factual and legal rationale for the discovery being sought. A copy of this letter is

attached hereto as Exhibit "A". On October 12, 2012,  I received a reply from counsel for Cooper

Tire, a copy of which is attached hereto as Exhibit "B". As requested in the reply, I provided

counsel with further formalized requests on October 16, 2012. A copy of these requests is

attached hereto as Exhibit "C". As outlined in your Order at the hearing, please accept this letter

as the Plaintiff's surreply to Cooper's latest response to the parties discovery dispute. Prior to

submitting this surreply, counsel held a fifty-five minute phone conference on October 24, 2012.

Unfortunately it was not productive. While Cooper has apparently offered to marginally expand

1

the scope of the documents it is willing to provide, their response is, regrettably, evasive and incomplete.

For example, it promises to produce certain additional separation-related adjustment data for "GTSes that are the same size and the same load range as the Moss tire and are constructed with certain similar components." This response is inadequate because, in addition to retaining the arbitrary limits on size and load range, it also fails to describe which "similar components" Cooper is referring to. Similarly, in response to requests regarding documents relating to the skim stock and innerliner of the subject tire, Cooper responds that they are "willing to produce test programs, product change notifications, and adjustment follow-up reports related to the implementation" of the skim stock and inner liner, but they fail to enumerate what those documents include and they are improperly limited to three narrow categories ("test programs, product change notifications, and adjustment follow-up reports") and fail to include broader categories of documents like memos and emails and the ingredients and formulas of the compounds themselves.

In response to the request by the court and Cooper Tire's counsel, and in an effort to further articulate the engineering issues which are at the heart of the Plaintiff's defect claims, the Plaintiff submits herewith an additional affidavit from Troy Cottles, an expert in tire failure analysis. A copy of Mr. Cottles' affidavit is submitted herewith as Exhibit "D". Further, what follows is an overview of the science and engineering of tire design and construction.

### The Science Of Tire Construction And Tread Separations

It is expected in the tire industry that tires must be designed and manufactured to perform safely when placed on a vehicle in a vast variety of foreseeable conditions. In an effort to meet applicable standards in the industry, this is often referred to as a "robust" design. This essentially

2

recognizes that a tire must perform satisfactorily in all kinds of conditions including extreme

cold and heat, uneven road surfaces, pot holes, wet and dry road surfaces, and repeated flex

cycles. A robust tire must be able to resists damage from normal road hazards. It is a well-

accepted principle throughout the tire industry that the fatigue life of a tire should exceed its

tread life by some design / safety margin. In other words, it should "wear out" before it falls

apart. Accordingly, the design and manufacturing processes of a tire's construction is critically

important in meeting this well-accepted objective. See Affidavit of Troy Cottles attached hereto

as Exhibit "D"

The diagram below illustrates the basic components of a tire.



The basic components of a tire are put together by hand according to a tire

manufacturer's design specifications. The result is a soft, pliable "green" tire. The green tire is

then "vulcanized" or cooked at a certain temperature (usually above 300 degrees) for a set period

of time. During the vulcanization process, the different components are supposed to chemically

bond to one another and the final result should be a tough, durable tire. Molds are used to give

tires their tread patterns and outer markings. As explained by Mr. Cottles, the basic tire

components are follows:

- **TREAD:** The tread is the portion of the tire in direct contact with the road surface. Treads are made in different patterns that correspond with desired use (i.e. Off-road v. highway).

- **SUBTREAD:** The subtread is the layer of rubber lying directly beneath the tread and above the upper steel belt. The subtread serves two primary functions for consumers. It provides additional insulation between the road and the vehicle for a softer ride. It also contributes to the tire's rolling resistance, or fuel economy, and performance.

- **BELTS:** The belts are strips of rubber with strands of steel wire cable running through the rubber at an angle (also referred to as "bias") to the edge of the belt. In most steel belted radials, the belt system consists of two layers or plies whose steel cords run in different directions to form a triangulated structure. The belt package is very stiff, which in turn provides cornering and handling ability. The stiffness of the belt also acts as a stabilizer, reducing the movement in the elements of the tread to provide traction and reduce wear. Most steel belted radials have two belts, which are referred to as the "upper" or "top" belt and the "lower" or "bottom" belt. The steel cord used in the belts consists of multiple filaments twisted together to form a cable.         Each belt consists of a layer of rubber with a series of brass-plated steel cables running diagonally through it at an angle to the edge of the belt. The cables must be bonded securely to the surrounding rubber. The steel filaments used in the cables within the belt are plated to a thin layer of brass alloy to enhance bonding, which is achieved by means of a chemical reaction between this brass plating and the surrounding rubber in the belt. This reaction takes place under the influence of high heat and pressure when the complete tire is cured, or vulcanized, after the components have been assembled. The bonding reaction involves complex chemical changes in the brass plating and the adjacent surrounding rubber, which causes the molecules of the two substances to link with each other.

- **SKIM STOCK:** The rubber used between the steel belts is referred to as "Skim Stock". Skim stock is what makes the belts adhere to one another. Skim stock consists of a mixture of various chemical ingredients, including anti-degradants (added to resist deterioration and loss of physical and adhesive properties), reinforcing agents (added to make the tire sufficiently malleable), and accelerators (added to cause the molecules of the compound to knit together when a particular temperature and pressure are applied for a given length of time during the vulcanization process). The actual skim stock formula is referred to by a certain internal code.

- **WEDGE:** Also known as Belt Edge Gum Strips. A tire's wedge (if it has one) is a rubber insert between the ply and belts. It helps to keep the tire level and flat with the road. Additionally, it provides stiffness at the belt edges. The Mastercraft Courser A/T

4

does not contain a wedge.  If the halogenated butyl is not the correct concentration, air can seep through the wall causing a tread separation.

- **INNERLINER:** The innerliner is the inner most layer of the tire.  Its main functions are to retain the compressed air inside the tire and tire pressure.  Due to its low air permeability, butyl rubber, or halogenated butyl rubber compound, is the primary rubber compound used.

- **SIDEWALL:** The sidewall of a tire protects the plies from possible damage.  It also provides flexibility to the tire, which contributes to the ride and stability characteristics of an automobile.  The sidewall contains information that helps to identify the type of construction as well as the tire size, aspect ratio, speed rating, date of manufacture and the location of manufacture.

- **BEAD:** The Bead component of the tire is a non-extensible composite loop that anchors the body plies and locks the tire onto the wheel assembly.  The bead wire loop is made from a continuous steel wire covered by rubber and wound around with several continuous loops.

Although the incorporation of steel belts into tires offers the advantages of additional impact and puncture resistance, it also presents a design problem.  The rubber compounds routinely used in the manufacture of the steel belted tires will not adhere to the steel wires used to make the steel belts.  In order to gain proper adhesion, manufacturers must coat the steel wires before incorporating them into the tire construction.  The inherent physical differences between steel and rubber in their flexibility, however, create a potential for tread separations. Accordingly, tire manufacturers need to incorporate into their design adequate countermeasures in order to prevent catastrophic tread separations which have been associated with substantial injury and death to drivers and passengers alike.

It is generally acknowledged that the shoulder of the tire is the location in the tire that develops the highest stresses and heat buildup.  This stress can lead to a tread separation. Various mechanical and chemical solutions have been developed to reduce the heat, to protect against the effects of aging of the polymer materials and to diffuse the stresses.

5

One of the most commonly employed devices to help prevent a tread separation is the incorporation of a belt wedge, which is placed between the outer and inner steel belts at the belt edge. This wedge is generally triangular in shape and serves both to reduce heat and to diffuse stress.

The following is an illustration of a tire with a belt wedge:



Another effective means of dealing with the potential for tread separation is the use of a nylon cap or nylon edge strips, which are placed on top of the outer steel belt to act as a tourniquet to restrain the movement of the belts at the shoulder edges.

The following is an illustration of a tire with nylon cap plies:

6



As articulated by Mr. Cottles, Cooper's Mastercraft Tire (the "Subject Tire") contains neither a belt wedge nor a Nylon Cap Ply and, as a result, is susceptible to tread separation. Additionally, another cause of tread separations is the use of a permeable inner liner. The innerliner is the material that forms the chamber that holds the air in the tire. The goal of the innerliner is to reduce the flow of air and moisture throughout the tire. Various rubbers are used to create the innerliner, one of which is halobutyl rubber. The higher the halobutyl content of the inner liner material, the more impervious the inner liner becomes.

### The History of Defects in Cooper Tires

Cooper's own documents tell the story of a long history of subpar manufacturing and design processes at the tire company. In a case recently litigated in the U.S. District court, Southern District of Texas, the plaintiffs responded to Cooper's Motion for Summary Judgment by setting out a timeline of Cooper's knowledge of the risks and dangers associated with its tires. Idar v. Cooper, Civil Action No. 2:10-CV-00217. The plaintiffs' response brief in the Idar case, submitted herewith as exhibit "E," is a matter of public record; thus, the information contained

therein is not confidential.  The documents used to support the plaintiffs' claims, however, were filed under seal at Cooper's request. These are internal documents which the plaintiff seeks in the instant case but do not yet have access to.

The following excerpt from the plaintiff's response brief in Idar outlines, what the documents illustrate.  The reference to Bates numbers are those which were before the Court in Idar.

**"Beginning at least as early as 1994 and continuing into 1995, there was an increasing trend in which Cooper subjectively identified a problem involving separations between the belts in Cooper's tires. Ex. 2 [6158].**

**Cooper identified the necessity for both manufacturing and design changes as part of the long-term plan to go forward. Id. During this timeframe, Cooper gained objective confirmation of its subjective understanding about the loss of adhesion between the treads and belts. Ex. 3 [5096-103]; Ex. 4 [5105-11].**

**In 1996, Cooper objectively noted a marked increase in liability claims related to tread peels from 1995 and continuing into 1996, and this was especially noticeable in Texas. Ex. 5 [3980-81]. Later that same year, Cooper subjectively acknowledged a reduction in the quality of its tires and an increase in the liability claims and complaints due to tread separations. Ex. 6 [3984]. Cooper objectively recognized the need for long-term action to reduce manufacturing problems such as eliminating air entrapment and the need for design changes such as improving its belt rubber just to get Cooper tire back up to Cooper's quality expectations from prior years. Id. [3985-86]. Cooper's internal documents from this same timeframe confirm that Cooper was subjectively and objectively aware that those tires sold for use in warmer climates were suffering separations at a higher rate. Ex.7 [3271-72].**

**In 1997, objectively, the warranty returns on Cooper's tires were still going up significantly, and in 1998 Cooper was subjectively aware of the need to improve in order to meet customer expectations. Ex. 8 [4383]. In that same timeframe, Cooper gained further objective confirmation that tire design changes could improve the resistance against tread separations, and that additional improvements in durability against separations were warranted. Ex. 9 [10567].**

**In 1998, General Motors provided an objective assessment of Cooper's technical capability, manufacturing capability, and quality philosophy and Cooper was made subjectively aware that its capabilities were "very limited" and "dated significantly" and "lag" behind the tire industry. Doc. 65-5. General Motors's objective assessment also made Cooper subjectively aware that Cooper "lacks both**

the tools and the personnel to compete" to produce "tires with the quality and uniformity levels required by General Motors." Id.

In this same timeframe, Cooper also objectively evaluated its own tires and became subjectively aware that specific design and manufacturing changes could significantly improve Cooper's tires in terms of their ability to resist tread separations. Ex. 10 [20004]. Moreover, in 1998 and 1999, the warranty returns on Cooper's tires that suffered separations were still continuing to increase. Ex. 11 [19694].

In 1999, Cooper was objectively and subjectively aware of the need to identify how Cooper tires were performing in connection with separations in tires sold into different markets with different climates and environments. Ex. 12 [4015]. In this context, Cooper was subjectively pondering whether its separations were resulting in a poor-quality image, and Cooper was objectively identifying the design criteria that its tires should be designed to wear out before the separate. Id. In this context, Cooper formed a Tire Durability Team to try to enhance Cooper's subjective awareness of the growing tread separation problem. Ex. 13 [4619-23].

In 2000, Cooper's Tire Durability Team continued to meet and objectively evaluate methods for Cooper to change the design and manufacture of its tires to reduce tread separations, but Cooper subjugated this goal to the requirement that Cooper would not incur much cost for such improvements. Ex. 14 [4069-70]. As a result of these meetings, Cooper was objectively and subjectively aware of specific tire designs and tire manufacturing practices that other tire manufacturers employ – but which Cooper generally does not employ – to reduce the risk of tread separations, especially in states like Texas. Ex. 15 [5429-35, 3260-67]; Ex. 16 [2935-38]; Ex. 17 [10610]; Ex.18 [4398- 406]. Cooper's internal documents explicitly confirm that Cooper subjectively acknowledged it had a responsibility to improve its tires' resistance against tread separations, but deliberately chose the cheapest change so as to avoid incurring costs. Ex. 19 [8195-96]; Ex. 20 [4161]; Ex. 21[6873-76]; Ex. 22 [4756-61]; 23 [10545]. During this same timeframe, Cooper also objectively documented an increase in tread separations, mainly in Texas. Ex. 24 [4394].

In 2001, Cooper tested various alternative designs to mitigate the risk of tread separation. Ex. 25 [3207-17]; Ex. 26 [4445]. The results for the tire design change which Cooper had adopted (as the cheapest of all the design or manufacturing changes Cooper considered) were mixed. Ex. 25 [3210-11]. Other alternative designs that Cooper was testing in this timeframe, but which Cooper failed to incorporate in the tire at issue, are marketed overseas by Cooper to "reduce tread separations." Doc. 65-_. Cooper has publicly acknowledged that there is "a defect which relates to motor vehicle safety" inherent in a "belt separation" because it can foreseeably result in "a vehicle crash." Ex. 26; see also Ex. 27.

The court in the <u>Idar</u> case had access to the documents referenced as exhibits in the plaintiffs' response brief. Based on a review of those documents, the Court agreed with the plaintiffs that there was sufficient evidence to submit the question of punative damages to the jury. As such, Cooper's Motion for Summary Judgment on Punitive Damages was denied. (See Order for Summary Judgment, submitted herewith as Exhibit "F").

In its Order, the court pointed out that the plaintiffs put forth "a variety of documentary support that beginning as early as 1994, Cooper had subjective knowledge of problems involving separations between the belts in Cooper's tires." The Court specifically referenced a number of documents, including a letter to Cooper dealers which admitted that "'a defect which relates to motor vehicle safety exists' in a number of Cooper tires including four varieties of 'Cooper Trendsetter' tires". (Exhibit F, Order in <u>Idar</u>, p. 4). The Court also pointed to documents showing that Cooper tested various alternative designs for its tires to mitigate the risk of tread separations, but chose not to incorporate those designs.

The plaintiffs' timeline in <u>Idar</u>, which detailed Cooper's knowledge of a problem and failure to correct the dangerous conditions its tires, and the Court's Order confirming such, are certainly interesting; however, the brief and Order do little to help Plaintiffs in this case without having the benefit of the supporting documents.

For this reason, Plaintiffs sent specific discovery requests, asking for similar documents – many of which have still not been produced.

### The Status Of The Instant Discovery Dispute

At the outset of the case, Plaintiffs' sent Cooper discovery requests relating to the design and manufacture of the subject tire. In response, Cooper submitted evasive and incomplete answers riddled with unsupported boilerplate objections, refusing to produce large categories of

information to which the Plaintiff is entitled. At the recent hearing on the Plaintiff's requests, the Court and counsel for Cooper voiced concerns that the requests identifying documents only by Bates numbers in other cases, did not sufficiently describe the context in which the documents would relate to the claims in the instant case. Additionally, more clarity on the nature of the Plaintiff's defect theories were requested. Accordingly, the recent exchange of letters, as well as the submission of a second affidavit by Mr. Cottles which are included herewith, attempt to address those concerns.

In his second affidavit, Mr. Cottles provides an examination of the anatomy of steel belted radial tires, and addresses the issue of the identical components used throughout Cooper's radial passenger and light truck tires, and the identical nature of the failure mode of Cooper steel belted radial tires which have resulted in tread separations. In addition, Mr. Cottles underscores the probative value of documents related to tread belt separation that Mr. Cottles has seen in cases in which he has testified and the constraints of attempting to describe them in detail while complying with numerous protective orders, apparently to protect the confidentiality of Cooper's business records.

In order to prove the elements of his case on strict liability, negligence and gross negligence, the Plaintiff requested information from Cooper relating directly to the factors that contribute to tread separation. Specifically, Plaintiff requested information within the following categories:

- **Tread separation problems win Cooper passenger and light truck tires;**
- **Information relating to the development, composition, and adoption of the current skim stock formula and the antidegradant package used in it;**

11

- **Information relating to the development, composition, and adoption of the innerliner used in the Moss tire;**
- **Adjustment data and data tracking returned tires;**
- **Belt edge gum strips or belt wedges;**
- **Nylon cap plies or spiral nylon overwrap;**
- **The expected lifespan of the tire; and**
- **Deposition transcripts of Cooper employees taken in previous tread belt separation cases.**

### Cooper's Unilateral Limitation on the Scope of Discovery

In response to Plaintiffs' discovery requests, Cooper argues that it should not have to produce documents that are outside what it has unilaterally defined as the "scope of discovery." Cooper's self-defined scope of discovery is information relating to the same "Green Tire Specification" (GTS), in this case GTS 5237. A GTS for a tire is similar to a blue print for a house. Any deviation from that blue print results in a different GTS. Cooper also contends that the scope of discovery should be limited to information about tires manufactured at the Texarkana Plant during a relatively limited time frame.

Cooper's unilateral limitation of discovery, and its self-serving definition of "similar tires," is untenable and incompatible with New Jersey law or the Federal Rules of Civil Procedure. The scope of discovery under the rules is broad and encompasses all information that is "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). Cooper's proposed definition of "substantially similar" as having an identical GTS is also far removed from even the simple dictionary definition of "similar," which, according to

Meriam-Websters Dictionary is "having characteristics in common: strictly comparable," or "alike in substance or essentials."

What Cooper will not tell this Court is exactly how limited their proposed discovery actually is. When Cooper limits discovery to one GTS, it is attempting to limit discovery to the EXACT SAME tire as the failed tire. Cooper uses the term "the green tire spec" to mislead the Court into believing it is producing much more than it actually is. For instance, Cooper's definition would not include this exact same tire manufactured at the same plant on the same day, but in a different size. It may have the exact same components, but because it is one size smaller or larger, Cooper would not produce those documents.

As an illustration of this fallacious argument, the analysis conducted by Cooper Tire engineers when investigating tread separation concerns do not restrict their inquiry by Green Tire Specification, but rather test throughout tire lines for a common failure. This is evidenced by the testimony of Bruce Currie who for years testified as Cooper's corporate representative in tread separation cases pursuant to F. R. Civ. P. Rule 30 (b)(6). See excepts from the June 7, 2011 deposition of Bruce Currie in <u>Logan v. Cooper Tire</u>, Case No. 5:10-cv-00003-KSF, U.S. Distr. Ct. for the E. Dist. of Kentucky, attached hereto as Exhibit "G", as well as documents produced by Cooper Tire in the instant litigation, identified as Bates Nos. CCMoss_G0001775-1816 (These documents are being furnished to the Court under separate cover as they have been designated confidential pursuant to the protective order, and are referred to here as exhibit "H".)

Cooper's arbitrary temporal limitation on the scope of discovery in this case is also contrary to New Jersey law. As an initial matter, the Plaintiff has already discussed that data and internal memorandums at Cooper from times prior to the manufacture of the subject tire are relevant to Plaintiff's claims regarding Cooper's notice of the defects of its tires and the

likelihood of those tires to separate. In addition, because under New Jersey law Cooper is under

a continuing duty to warn of defects of which it becomes aware after distribution of a product,

Feldman v. Lederle Laboratories, 97 N.J. 429, 456-57 (1984), documents relating to Cooper's

ongoing problem with tread separations are also relevant to the plaintiff's claims.

Finally, as we have addressed, Plaintiff's requests regarding "similar tires" are consistent

with the holding in other numerous other similar cases, including: Idar v. Cooper, Civil Action

No. 2:10-CV-00217, In re Cooper Tire & Rubber Co., 568 F.3d 1180, 1183, 1191-92 (10th Cir.

2009) (holding that Cooper was required to produce documents relating to similar tires well

beyond the GTS at issue), Ex parte Cooper Tire & Rubber Co., 987 So.2d 1090 (Ala. 2007)

(allowing scope of discovery to include all instances in which Cooper's design and

manufacturing process had resulted in tires that failed as a result of tread separation regardless of

size or tread pattern), Cooper Tire & Rubber v. Rodriguez, 2 S0.3d 1027, 1029 (Fla.3d DCA

2009) (holding that Cooper's definition of similar tires was too narrow, and discovery would

encompass documents related to any model of Cooper tire containing the defects alleged by the

plaintiff) and Mann ex rel. Akst v. Cooper Tire Co., 33 A.D.3d 24, 35 (N.Y. App. Div. 2006)

(holding that Cooper's definition of similar tires is an "absurdity since Cooper Tire will be able to

conceal documents probative on the issues of notice, defectiveness and dangerousness. For the

same reasons, it would be absurd to limit disclosure to the same plant as the one where the

subject tire was manufactured).

## Conclusion

As demonstrated in the materials submitted by the Plaintiff, there has been a sufficient

showing that the documents requested are at least reasonably calculated to lead to admissible

evidence. As such, this Honorable Court should order their production by the defendant, Cooper Tire, without further delay.

Respectfully submitted,

**LEVINSON AXELROD, PA**
Attorneys for Plaintiff

Andrew D. Nebenzahl, BBO# 368065
Smith Lee Nebenzahl, LLP
One Post Office Square
Sharon, MA 02067
(781) 784-2000
Ronald B. Grayzel
Levinson Plaza
2 Lincoln Highway
Edison, New Jersey 08818-2905
732-494-2727

Dated: 10/26/12

# GEORGE MOSS V. COOPER TIRE & RUBBER COMPANY

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

### Civil Action No.:  3:11-CV-00689-FLW-LHG

# PLAINTIFF'S EXHIBIT A



Smith Lee Nebenzahl

October 5, 2012

The Honorable Lois H. Goodman
United States District Court
District of New Jersey
402 East State Street
Room 2020
Trenton, NJ 08608

RE:   **Moss v. Cooper Tire & Rubber Co.**
      **<u>Civil Action #: 3:11-cv- 00689</u>**

Dear Judge Goodman:

The Plaintiff George Moss submits this letter in response to the Court's request for a revision of the parties' discovery requests and responses. Mr. Moss's claims against Defendant Cooper Tire & Rubber Co. arise from the failure of the Cooper tire on a 1996 GMC Sierra, which resulted in a single-vehicle collision in which he suffered serious injury. He has brought claims of design and manufacturing defects against Cooper.

The Plaintiff's first requests for the production of documents were provided to the Defendant on July 18, 2011. Cooper asserted that among the documents sought by the Plaintiff were trade secrets and other confidential information. After a lengthy negotiation between the parties, a protective order was agreed to which was entered by the Court on March 1, 2012. The Defendant provided its first set of documents in response to the Plaintiff's request in the days following the entry of the order, and supplemented that response in the following month.

1

**I. Statement of Facts**

This case involves a catastrophic tread separation of a Cooper, Courser Mastercraft tire (hereinafter the "subject tire") that occurred on September 18, 2009. At approximately 1:30 in the afternoon, the plaintiff George Moss was driving on Route 287 when the tire tread separated causing a blow out. As a result, the Plaintiff lost control of his vehicle and it impacted a guard rail, flipped over, and Mr. Moss was ejected from the vehicle sustaining severe and permanent injuries. The tire was manufactured in January of 2003, making it approximately six and a half years old at the time of its failure. It was placed in service on November 6, 2004. The tire had been run for only 36,241 miles, and had approximately one half of its original tread depth remaining.

The Plaintiff claims that the tread separated due to both design and manufacturing defects of the tire. The Plaintiff further alleges that Cooper had prior knowledge of these defects and their propensity to lead to tread separations resulting in major- and in some cases deadly- injuries to consumers. Specifically, the Plaintiff claims the tire was defective due to a number of engineering deficiencies which are addressed generally in the Affidavit of Troy Cottles, submitted previously to the Court.

Among those deficiencies is the failure to include full nylon cap plies, a design component that helps resist tread separation and was available at the time of the tire's manufacture. Nylon cap plies are sometimes referred to by Cooper and its employees as "spiral nylon overwrap" or "SNOW." This nylon is used to wrap around the two belts of the tire, reducing the likelihood of a belt-to-belt tread separation of the kind that occurred in this case. The Plaintiff alleges that Cooper was familiar with the benefits of using nylon in its tires to reduce the likelihood of tread separation but failed to adopt that safety measure. Cottles Aff. ¶ 23. The subject tire also fails to include belt wedge gum strips, sometimes also called "belt edge gum strips," or BEGS, which are a safety feature in tire design that was available at the time of the tire's manufacture. BEGS are wedges that, if present in a tire, can absorb the stresses to a tire at the belt edges and help to resist separation. Cottles Aff. ¶¶ 10, 14, 25.

2

Additionally, the skim stock used in the subject tire is also alleged to be defective in its design. Skim stock is a vitally important rubber compound involved in the kind of tread separation that occurred in this case because it provides adhesion for the various tire components. Cottles Aff. ¶¶ 15, 21. "It is vitally important that the properties of the skim rubber include good adhesion to the steel cords and good fatigue resistance to prevent the belts separating while the tire is in service." Cottles Aff. ¶ 15. The Plaintiff also alleges that the skim stock was defective because it may have included a defective antidegradant package. A defective antidegradant package, sometimes also called an antioxidant package, or a defective skim stock formulation, can lead to the kind of accelerated deterioration of the tire's inner components of the kind that was exhibited in Mr. Moss's tire. See Cottles Aff. ¶¶ 14, 17.

The Plaintiff also alleges that the inner liner of the subject tire was defective, both because of its construction and because of its composition, and that defects in the inner liner may have led to the accelerated deterioration of the internal components of Mr. Moss's tire. Cottles Aff. ¶¶ 10, 17. Finally, the plaintiff alleges that the curing process was defective in that it did not allow for optimal bonding of the components – again leading to a greater likelihood of tread separation. Furthermore, the plaintiff claims the tire was defectively manufactured in that it contained trapped air, liner pattern marks, oxidation of the belt skim component, wire snaking and bare wire.

An integral part of the Plaintiff's claim is its allegation that Cooper knew of the propensity of its tires to separate and yet failed to take preventive measures in the design and manufacture of its tires and failed to provide warnings to the consumers who purchased them. Evidence of Cooper's prior knowledge of these defects has appeared in numerous other cases arising from the tread separations of other Cooper tires. For example, Cooper employees have testified in other cases that Cooper created an internal group called the "Tire Durability Team" to investigate the recurring problem of tread separation. See, e.g., the testimony of Steven Cramer in Ivan Toe, et al. v. Cooper Tire & Rubber Co.,

3

et al., in the Iowa District Court of Polk County, Case No. CL 106914. Additionally, the Plaintiff

alleges that Cooper knew that other tire manufacturers had adopted certain preventive measures, such

as BEGS and SNOW, or improvements to the formulation of its tire components, to prevent similar

tread separations, and that although Cooper studied the possibility of introducing these measures into

its tires, none of those measures were incorporated into the subject tire.

## II. Scope of Permissible Discovery in Products Liability Litigation

The Federal Rules of Civil Procedure provide for lenient and open discovery. Indeed,

"relevancy is construed more broadly during discovery than at trial." Centurion Indus., Inc. v. Warren

Steurer and Assoc., 665 F.2d 323 (10th Cir. 1981). It is well-settled that discovery is not limited to

information that will be admissible at trial. Culligan v. Yamaha Motor Corp., USA, 110 F.R.D 122

(S.D.N.Y.1986); Stark v. Photo Researchers, Inc., 77 F.R.D. 18, 20 (S.D.N.Y. 1977); Xerox Corp. v.

IBM Corp., 75 F.R.D. 668, 670 (S.D.N.Y. 1977). "It is not ground for objection that the information

sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead

to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1); see also Josephs v. Harris Corp.,

677 F.2d 985, 991 (3rd Cir. 1982). Rather, in the context of discovery, relevance "has been construed

broadly to encompass any matter that bears on, or that reasonably could lead to other matters that could

bear on, any issue that is or may be in the case." Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351

(1978).

The scope of discovery must be guided by the claims in the case. The Plaintiff's claims in this

case come under the New Jersey's law imposing strict liability on manufacturers if they fail to produce

products that are "reasonably fit, suitable, and safe when used for their intended or reasonably

foreseeable purposes." N.J. Stat. Ann. § 2A:58C-2; Zaza v. Marguess & Nell, Inc., 144 N.J. 34, 675

A.2d 620 (1996). The malfunctioning of a product in the absence of abnormal use or reasonable

secondary cause is evidence of a defect. See Scanlon v. General Motors, Corp., 65 NJ 582, 326 A.2d

4

673 (1974). The following factors must also be considered in order to determine if the there is in fact a design defect: 1. the usefulness and desirability of the product aspects; 2. the safety aspects of the product; 3. availability of substitutes; 4. the ability to eliminate its unsafe characteristics without great expense or impairing usefulness; 5. the user's ability to avoid danger; 6. the user's anticipated awareness of the inherent dangers and their avoidability; and 7. feasibility of spreading loss. It is the Plaintiff's burden to establish the existence of a reasonable alternative design that is both practical and feasible. Lewis v. American Cyanamid, 155 N.J. 544, 570 (1998). Alternatively, a manufacturing defect is evidenced when a particular product is not produced in accordance with the manufacturers standards for that same product. See N.J. Stat. Ann. § 2A:58C-2. New Jersey law also allows for punitive damages in strict liability defect cases where there is clear and convincing evidence of actual malice or wanton and willful disregard by the manufacturer of persons who foreseeably might be harmed by the defect. See Herman v. Sunshine Chem. Specialties, Inc., 133 NJ 329, 627 A.2d 1081 (1993). The following factors are considered in determining whether to impose punitive damages: 1. the likelihood at the relevant time that serious harm would arise from the defendant's actions; 2. the defendant's awareness of and reckless disregard of the likelihood that serious harm would arise from his conduct; 3. the conduct of the defendant upon learning that its initial conduct would likely cause harm; and 4. the duration of the conduct or any concealment of it by the defendant. Information relevant to all of these factors must therefore be relevant to the Plaintiff's claim. Because the scope of discovery is guided by the claims and defenses, discovery in this case must extend to each of these factors required to support the Plaintiff's claim.

It is also well settled that in product liability litigation courts have allowed plaintiffs to introduce evidence of substantially similar occurrences or lawsuits on the issue of notice and causation. 3 Frumer & Friedman, Products Liability § 18.02[1][b]-[g] (2004); 6 James Wm. Moore, et al., Moore's Federal Practice § 26.41[1][a] (3d ed.2004). ("[O]ther incidents similar to, or involving the same

product as, the incident in the lawsuit ... may be relevant to the claims and defenses under certain circumstances.)". The United Oil Co., Inc. v. Parts Assocs., Inc., et al., 227 FRD 404 (D. Md. 2005). Under New Jersey law, too, evidence of prior substantially similar accidents or occurrences is admissible to prove a product defect either by design or manufacture. See Ryan v. KDI Sylvan Pools, Inc., 121 NJ 276, 579 A.2d 1241 (1990); Wolf by Wolf v. Proctor & Gamble Co., 555 F. Supp. 613 (D.N.J. 1982).

During discovery, too, relevance is construed broadly enough to encompass information not only pertaining to the product that is the subject of the suit, but also to other substantially similar products. In fact, "discovery of similar, if not identical, models is routinely permitted in product liability cases." Culligan, 110 F.R.D. at 126 (S.D.N.Y. 1986). "[Discovery] of other accidents involving similar products is relevant in products liability cases to show notice to defendants of the danger and cause of the accident." In re Aircrash Disaster Near Roselawn, Ind., Oct., 31.1994, 172 F.R.D. 295, 306 (N.D. Ill. 1997), accord Nachtsheim v. Beech Aircraft Corp., 847 F.2d 1261, 1268 (7th Cir.1988); Gardner v. Q.H.S., 448 F.2d 238, 244 (4th Cir. 1971).

Moreover, courts have allowed discovery of information regarding the same component part in a different product in a number of product defect cases when that component part is related to the defect at issue. See, e.g., Fine v. Facet Aerospace Products Co., 133 F.R.D. 439, 441 (S.D.N.Y.1990) ("Generally, different models of a product will be relevant if they share with the accident-causing model those characteristics pertinent to the legal issues raised in the litigation."); Schaap v. Executive Indus., Inc., 130 F.R.D. 384, 387 (N.D. Ill. 1990) (holding information concerning similar models that have the same component parts to be discoverable); Bowman v. General Motors Corp., 64 F.R.D. 62, 70–71 (E.D. Pa. 1974) (allowing discovery of information about subsequent vehicle model with similar fuel system); Uitts v. General Motors Corp., 58 F.R.D. 450, 451 (E.D. Pa.1972) (allowing discovery of all information relating to similar accidents in vehicles manufactured by defendant with a spring

6

identical to the one at issue).

The defining characteristics of a substantially similar tire in this case is therefore whether the tire share the same alleged defects as the subject tire. For example, in In re Cooper Tire & Rubber Co., 568 F.3d 1180, 1183, 1191-92 (10th Cir. 2009), an appeals court affirmed a magistrate judges decision compelling Cooper to produce documents relating to similar tires well beyond the "green tire specification" at issue in that case. The appeals court found no error in the judge's conclusion that "the definition of substantial similarity might be more relaxed due to the plaintiffs' 'broad theory of the case.'" Id. at 1183. That theory included claims that "prior to the production of the [subject tire], Cooper realized that its tires suffered from an unacceptably high rate of tread separations, but deliberately failed to make design changes to combat this knowledge or warn consumers about the problems with its tires" and that "information available to Cooper before production of the tire even began confirmed that Cooper knew about these dangerous and defective conditions." Id. (internal citations omitted). Accord Mann ex rel. Akst. v. Cooper Tire Co., 33 A.D.3d 24, 35, 816 N.Y.2d 4 (N.Y. App. Div. 2006) (holding that Cooper's definition of similar tires is an "absurdity since Cooper Tire will be able to conceal documents probative on the issues of notice, defectiveness and dangerousness. For the same reasons, it would be absurd to limit disclosure to the same plant as the one where the subject tire was manufactured.")

In Ex parte Cooper Tire & Rubber Co., 987 So.2d 1090 (Ala. 2007), the Supreme Court of Alabama rejected Cooper's arguments for a writ of mandamus that would have prevented the discovery of documents in a tread separation case similar to this one. The court concluded that the scope of discovery compelled by the trial court, which encompassed all instances in which Cooper's design and manufacturing process had resulted in tires that failed as a result of tread separation regardless of the particular size or tread pattern of the tire, was appropriate and relevant. The court rejected Cooper's assertion that the only relevant information was that relating to the single tire, which in that case had a

7

GTS of 2879, that failed in that case.  The court noted that "the 'tread separation' defect alleged by the plaintiffs in this case was a factor in Cooper's design and manufacturing process in general rather than a feature of the 'GTS 2879' tire."  Id. at 1103.  Additionally, the court noted that "problems with tread separations were not limited to a particular model of tires manufactured by Cooper" and "the manufacture of the tires was to a large extent standardized and that the particular design and manufacturing process was substantially the same, regardless of a particular model."  Id.  Accord Cooper Tire & Rubber Co. v. Rodriguez, 2 So.3d 1027, 1029 (Fla. 3d D.C.A. 2009) (holding that "Cooper's definition of 'similar tires' was too narrow, and discovery would encompass documents related to any model of Cooper tire containing the defects alleged by the plaintiff).

In appropriate cases, a court may adopt a definition of substantial similarity that is influenced by a common absence of safety features.  In Cohalan v. Genie Industries, Inc., the court considered a discovery dispute in a products liability case arising from injuries sustained when a personnel lift tipped over.  276 F.R.D. 161, 162 (S.D.N.Y. 2011).  The court concluded that the plaintiff was entitled to discovery concerning different models of lifts, not just lifts with a size and features identical to the one involved in the accident, because the defect alleged by the plaintiff – an absence of certain safety features including an interlock system for outriggers that could prevent tipping – was common throughout numerous models of the defendant's lifts.  Id. at 165.  Moreover, the court noted that "at the discovery stage, information regarding [the defendant's] development of an interlock is pertinent to the legal issues in dispute in this case" because of the importance of establishing feasible alternative designs.  Id. at 166.

For purposes of discovery in this case, relevant information includes those documents that concern not only those tires that are identical to the subject tire, such as those that share the same GTS number or that were manufactured in the same plant, but also information concerning the broader category of similar tires which share the same defects alleged by the Plaintiff.  As an example, the

Plaintiff's discovery requests include a request for adjustment data (Cooper's term for the record of tires returned by the consumer as defective) not just for the subject tire, but for all tires which share the defects alleged by the Plaintiff, such as those tires with the same skim stock or inner liner. Similarly, the Plaintiff seeks information concerning similar incidents – tread separations – for all substantially similar tires regardless of whether the tire involved had a GTS identical to the subject tire. The arbitrary limitations that Cooper has imposed on discovery – withholding documents because they relate to tires with different sizes or from a different plant – bear no relation to the scope of the Plaintiff's claims. The design defects alleged by the Plaintiff are common to a broad category of Cooper tires and therefore documents relating to that broad category of substantially similar tires sharing that defective component are relevant to the Plaintiff's claims.

For those of the Plaintiff's discovery requests dealing with design omissions, such as the absence of BEGS or SNOW in the subject tire, Cooper's knowledge of the benefits of BEGS and SNOW in preventing tread separations is a critical issue in determining the feasibility of alternative designs. Defendant's knowledge of the dangers of the tires and the options to deal with these defects were global engineering concerns that transcend what it did or didn't do in regards to the specific model tire at issue in this case. Artificial limitations on discovery based on stringent definitions of "substantial similarity" will foreclose probative evidence that plaintiff needs to support his claim. Clearly, internal discussions at Cooper relating to any potential introduction of BEGS or SNOW would be probative of the feasibility of alternative designs as well as the existence of a defect. Discovery should not be limited to only those documents concerning BEGS or SNOW that also happen to discuss the subject tire, but should encompass all discussion at Cooper relating to the analysis of those safety features. As in Cohalan, 276 F.R.D. 161, (S.D.N.Y. 2011), the similarity at issue with respect to these requests is the absence of appropriate safety features. Discovery on the subject of these features should also not be limited to a handful of years surrounding the manufacture of the subject tire. The Plaintiff

alleges that Cooper had a long history of tread separation problems due to design defects in its tires, and that its knowledge of this problem dates back many years. The relevance of any internal discussions within Cooper relating to BEGS or SNOW is not negated by their age. Had Cooper hypothetically considered and rejected these features, for example, five or ten years before the subject tire was manufactured, that would still be relevant to the Plaintiff's claim of a defective design.

## III. Trade secrets

"[T]here is no absolute privilege for trade secrets and similar confidential information." Centurion Indus., Inc. v. Warren Steurer & Assocs., 665 F.2d 323, 325 (10th Cir. 1981), citing Federal Open Mkt. Comm. v. Merrill, 443 U.S. 340, 363 (1979) and 8. C. Wright & A. Miller, Federal Practice and Procedure § 2043 at 300 (1970). In fact, "orders forbidding any disclosure of trade secrets or confidential information are rare. More commonly, the trial court will enter a protective order restricting disclosure to counsel or to the parties." Federal Open Mkt. Comm., 443 U.S. at 362 n. 24. It is the burden of a party seeking to resist discovery to establish that the information sought contains trade secrets. 8. C. Wright & A. Miller, Federal Practice and Procedure § 2043 at 242-43 (3d ed 2010). "The burden of justifying the confidentiality of each and every document sought to be covered by a protective order remains on the party seeking the order." Pansy v. Borough of Stroudsburg, 23 F.3d 772, 786-87 (3rd Cir. 1994). In addition, the party resisting discovery must also show that disclosure of the information sought may be harmful. Id. It is only after the party resisting discovery has met its burden in this respect that the inquiry shifts to the relevance of the information and its necessity for the party seeking it. See id.

If the party resisting discovery meets its burden and establishes that the information sought is a protected trade secret, then "the burden shifts to the party seeking discovery to establish that the disclosure of trade secrets is relevant and necessary to the action." Centurion Indus., Inc., 665 F.2d at 325. The court's inquiry on this issue should include consideration of all pertinent circumstances, and

10

should weigh the competing interests involved "against the background of the total situation, including consideration of such factors as the dangers of abuse, good faith, adequacy of protective measures, and the availability of other means of proof." See C. Wright & A. Miller, Federal Practice and Procedure § 2043 at 249 n. 15 (3d ed. 2010), quoting Advisory Note to Rule 5-08 of proposed Federal Rules of Evidence, 46 F.R.D. at 371.

In deciding the issue of relevance, the inquiry is, as discussed at length above, *not* whether the information sought would be admissible at trial, but rather whether the information sought falls into the much broader category of relevancy to the issues raised in the litigation, including whether it would be reasonably calculated to lead to the discovery of admissible evidence. See Covey Oil Co. v. Continental Oil Co., 340 F.2d 993, 998 (10th Cir. 1965), cert. denied, 380 U.S. 964 (1965). On the issue of necessity, the court must balance the necessity of the information to the requesting party against any risk of injury that could result from the disclosure. "When the risk of harm to the owner of a trade secret or confidential information outweighs the need for discovery, disclosure through discovery cannot be compelled, but this is an infrequent result." Pansy, 23 F.3d at 787, quoting Arthur R. Miller, Confidentiality, Protective Orders, and Public Access to the Courts, 105 Harv. L. Rev. 427, 432-33 (1991).

During the course of discovery in this litigation the Defendant has so far objected to a significant number of the Plaintiff's discovery requests, at least in part, on the grounds that the documents requested by the Plaintiff contain trade secret information. The Plaintiff agrees that at least some of the information it seeks from the Defendant contains bona fide trade secrets. The current revised discovery requests, for example, seek the ingredients and formula of the skim stock and inner liner used in Cooper's tires, information which the Plaintiff concedes is a trade secret. Furthermore, it is because of the sensitivity to the Defendant's trade secret information that this Court entered a rigorous protective order, at Cooper's request, and under which the parties continue to operate.

11

Notably, there has been no assertion made by Cooper that Plaintiff's counsel, or anyone working with them, has deviated from the Order's requirements in any way. Nevertheless, the Defendant continues to resist discovery based on its assertion of trade secret protection for broad swaths of documents and information. The scope of the Defendant's assertion of trade secrets does not have sufficient factual support and fails to acknowledge the strong protections put in place under the existing protective order. The Defendant's assertion of fears of corporate espionage, for example, are supported by newspaper articles discussing incidents that occurred years ago and that did not involve either Cooper Tire or the technology at issue in this litigation. While the Plaintiff agrees that at least some of the information sought from the Defendant is confidential and deserving of protection, we also submit that the existing protective order is sufficient for that purpose.

The information that the Plaintiff seeks in this case is both relevant and necessary. The issue of relevance was discussed at length above. On the issue of necessity, it is important to observe that an integral part of the Plaintiff's theory is that Cooper knew of the defects in the subject tire but did not take known preventive measures and did not warn consumers about those defects. For example, the Plaintiff alleges that Cooper knew that its tires had a recurring problem with tread separations, that it created an internal group to investigate the problem, that it knew that other tire manufacturers had adopted certain preventive measures, such as BEGS and SNOW, to prevent similar separations, and that although Cooper studied the possibility of introducing these measures into its tires, none of those measures were incorporated into the subject tire. Therefore, it is crucial that the Plaintiff has access to material documenting the discussion that took place at Cooper concerning problems with tread separation in its tires, as well as the potential adoption of BEGS and SNOW, even if that discussion took place well before the subject tire was manufactured. It is also crucial that the Plaintiff not be limited to documents relating to just those identical tires that shared the same GTS as the subject tire, because the absence of safety features alleged by the Plaintiff spanned all products designed by Cooper.

12

For those discovery requests relating to the defective design of existing components in the subject tire, such as the inner liner, antioxidant package, and skim stock, the Plaintiff's claims of a defect relate to the composition of the components. It is necessary that the Plaintiff have access to the ingredients and formulas of those components, as well as their method of assembly, to determine the accuracy of the alleged defective components. Numerous courts have ordered the discovery of the formulas of skim stock or other tire components, including Cooper Tire's skim stock formula, in tread separation cases like this one. See, e.g.,Pimsner v. Nexen Tire Corp., No 03-CV-1373, N.D.N.Y, Nov. 29, 2004 (ordering tire company to disclose the formula of its skim stock); Phommachanh v. Cooper Tire & Rubber Co., No 98-2770-CA, Fl. Cir. Ct., Sept. 19, 2000 (ordering that Cooper Tire disclose the formula of all rubber components of subject tire); Lavelock v. Cooper Tire & Rubber Co., No. 00-CV-221072, Cir. Ct. of Jackson Co., Mo., Aug. 18, 2003 (ordering that Cooper Tire disclose percentage of halobutyl in inner liner of tire); Buxbaum v. Trustees of Ind. Univ., No. CDV-2000-31, Montana Dist. Ct., July 2, 2002 (ordering tire company to disclose the formula of its skim stock); Mann v. Cooper Tire Co., slip op. 04335, N.Y. App. Div., June 1, 2006 (ordering that Cooper Tire disclose the ingredients in its skim stock formula because they are "indispensable to the product liability suit"); Plyler v. Bridgestone, Corp., No. 05-CP-25-456, S.C. Ct. Comm. Pl., Aug. 15, 2007 (ordering tire company to disclose the formula of its skim stock because ); Stevens v. Ford Motor Co., No. 2005CP4300551, S.C. Ct. Comm. Pl., April 20, 2006 (ordering tire company to disclose the formula of its skim stock).

**IV. Revised requests for production.**

    **1. Any and all documents relating or referring to tread separation of Cooper passenger and light truck steel belted radial tires, regardless of the facility at which they were manufactured.**

There are three areas of proof in which the requested documents are most clearly both relevant

and necessary.  First, the information contained in the documents is probative on the basic issue of whether the tire in the instant case was in fact defectively designed.  Second, research, internal analysis, and reports from both well before *and* after the manufacture of the subject tire are relevant to the feasibility of alternative designs that the manufacturer might have used to eliminate the defect.  See N.J. Stat. Ann. § 2A:58C-2 (listing "availability of substitutes" and "the ability to eliminate unsafe characteristics without great expense or impairing usefulness" as two factors in the design defect analysis).  Third, the requested information is central to the issue of Cooper's alleged notice of the defects and failure to warn consumers of the propensity of its tires to fail as a result of its design flaws.

The Plaintiff claims that the design defect in the subject tire is associated with Cooper's long history of tread separation problems in its tires, and that Cooper had long known of the problems with its tires.  If documents supporting the Plaintiff's claim of Cooper's knowledge of tread separation happen to have been generated in the years before the subject tire was manufactured, they are no less relevant to the Plaintiff's claims.  It is therefore crucial that the Plaintiff has access to the discussions that took place within Cooper on the subject of tread separations over the course of the many years that the problem was discussed, not simply in the years directly before an after the subject tire was manufactured.

The Defendant has attempted to limit the production of documents to those directly dealing with the tires identical to the subject tire, that is, to other tires sharing the GTS 5237.  This unfairly limits the scope of the Plaintiff's claims.  As described above, the design defects alleged by the Plaintiff are not limited to only tires with the GTS 5237 specification and manufactured in the Texarkana plant.  Instead, the Plaintiff alleges design defects that was common throughout various lines of Cooper passenger and light truck steel belted radial tires.

**2. Any and all documents relating to the skim stock used in the subject tire, described by Cooper as skim stock 525D.  This includes but is not limited to the ingredients and formula of**

14

525D, any and all documents relating or referring to the development of 525D, any programs or studies involving modifications to prior skim stocks to arrive at the formulation of 525D,  and any and all documents, studies, reports, or programs involving the performance, improvements, problems, and/or costs of 525D or comparisons to previous Cooper skim stocks, including 525C. This also includes but is not limited to any and all documents which were relied upon by Cooper when developing 525D.

One allegation in the Plaintiff's claim is that the skim stock used in the subject tire was defective, providing insufficient adhesion or premature deterioration.  In order to establish the nature of the defect in the skim stock it is crucial that the plaintiff has access to the formula.  Additionally, documents relating to the development of the skim stock formula are necessary for the Plaintiff's claims relating to Cooper's knowledge of problems with premature aging of the skim stock used in its tires and Coopers notice of its ongoing problems with tread separations.

**3. Any and all documents referring or relating to the composition of the inner liner used in the subject tire and to the manufacture and assembly of the inner liner itself.  This includes but is not limited to any and all documents referring or relating to the adoption of the inner liner compound, 4193, used in the subject tire, its ingredients, including halobutyl content, as well as studies, reports, or other internal discussions relating to the inner liner compound 4193.**

The Plaintiff alleges that one of the defects in the subject tire is a defect in the inner liner. Therefore, as in the case of the skim stock of the subject tire, access to both the composition of the inner liner and documents relating to its development are relevant to the Plaintiff's inquiry.

**4. Any and all documents referring or relating to the "antioxidant package" or "antidegradant" used in the skim stock for the subject tire. This includes but is not limited to any and all documents referring or relating to the adoption of the antioxidant or antidegradant package used in the subject tire, as well as the ingredients and formula of that package.**

15

The arguments for the relevance and necessity of the documents requested are largely the same as those discussed in the previous requests for information relating to skim stock and inner liner. The premature deterioration of the skim stock in the subject tire is one allegation in the Plaintiff's claim and therefore information relating to the formula of that skim stock, and more specifically the antidegradant package, is both relevant and necessary.

**5. Any and all documents referring or relating to adjustment data or any other kind of record related to adjustments for any Cooper passenger or light truck steel belted radial tire which shares either the skim stock, antioxidant package, or inner liner compound with the subject tire.**

As discussed above, a central part of the Plaintiff's claim regards Cooper's knowledge of the tendency of its tires to suffer tread separation due to a defective design. Evidence of this knowledge can be demonstrated by the records, kept by Cooper, of those tires that were returned to the manufacturer because they were defective. Cottles Aff. ¶ 24. This information is called "adjustment data" within Cooper Tire. The defects alleged by the Plaintiff are common to many Cooper tires. An accurate picture of the tendency of Cooper tires to separate due to the defects alleged by the Plaintiff can only be gained by an analysis of the data of all Cooper tires sharing those defective design elements. As in the case of documents relating to tread separations, the relevance of this data does not disappear with the passage of time. Records of older separations, or even more recent ones, are just as probative on the issue of the existence of a design defect and Cooper's knowledge of those defects as long as the records are for tires that share the same design defect with the subject tire.

**6. Any and all documents relating or referring to the use of the belt wedges or, as it is sometimes called by Cooper, "belt edge gum strips," or BEGS. This includes but is not limited to any and all documents referring or relating to the use of BEGS by other tire manufacturers, as well as documents, comparisons, reports, or programs referring or relating to the actual or**

potential introduction or removal of BEGS to or from any Cooper tire, including documents related to the costs, effectiveness, durability, and reliability.  This also includes but is not limited to all research viewed by Cooper employees when considering the potential introduction or removal of BEGS from any Cooper tire, including but not limited to documents obtained from consultants and information generated by other manufacturers but considered by Cooper.

One of the design defects alleged by the Plaintiff is the absence of appropriate safety precautions in the belt edge treatment of the subject tire, including the absence of belt edge gum strips, or BEGS.  The Plaintiff alleges that the design defect in the subject tire is associated with a long history of tread separations in Cooper tires due, in part, to the absence of BEGS, and that Cooper was aware of this problem and failed to warn consumers of it.  An important element of the proof for the Plaintiff's claim is to show that over the course of many years Cooper considered and rejected a basic safety precaution that had become standard in the tire manufacturing industry.  It is therefore important that the Plaintiff has access to any discussion that took place within Cooper during the many years that they may have  learned of and systematically rejected the introduction of this tread separation prevention measure.

7. Any and all documents relating or referring to the use of nylon cap plies, or, as sometimes described by Cooper, "spiral nylon over wrap," or  SNOW.  This includes but is not limited to any and all documents referring or relating to the use of SNOW by other tire manufacturers, as well as documents, comparisons, reports, or programs referring or relating to the actual or potential introduction or removal of SNOW to or from any Cooper tire, including documents related to the costs, effectiveness, durability, and reliability.  This also includes but is not limited to all research viewed by Cooper employees when considering the potential introduction or removal of SNOW from any Cooper tire, including but not limited to documents obtained from consultants and information generated by other manufacturers but considered by

17

Cooper.

The argument for the relevance and necessity of the documents in this request is similar to the argument for the documents sought in request number 6, above. One of the design defects alleged by the Plaintiff is the absence of nylon cap plies, or, as they are sometimes described by Cooper, "spiral nylon overwrap," or "SNOW." As in the case of BEGS, the Plaintiff alleges that this design defect in the subject tire is associated with a long history of tread separations in Cooper tires due, in part, to the absence of SNOW, and that Cooper was aware of this problem and failed to warn consumers of it. An important element of the proof for the Plaintiff's claim is to show that over the course of many years Cooper considered and rejected the adoption of SNOW in its tires, even though it, too, eventually became a standard practice in the tire manufacturing industry. It is therefore important that the Plaintiff has access to any discussion that took place within Cooper as they learned of and systematically rejected the introduction of this tread separation prevention measure.

**8. Any and all documents relating or referring to the expected lifespan of the Courser Mastercraft tire, including but not limited to all documents, including both internal Cooper documents or memorandums, publicity or promotional material, or warnings to consumers or customers, that relate or refer to the number of years the tire is expected to last, the length of the warranty for the tire, the number of miles the tire is expected cover, or the amount of tread depth the tire is expected to retain at any point in its lifespan.**

The Defendant has suggested that the subject tire may have reached the end of its expected life at the time of the tread separation that injured Mr. Moss. Therefore, all documents relating to expected lifespan of the tire are relevant to the Plaintiff's claims.

**9. Any and all documents relating or referring to Cooper passenger or light truck steel belted radial tires that have been returned due to tread separation, whether that designation was made by the dealer or by a Cooper representative, including but not limited to analysis, data,**

18

records or photographs from any physical examination conducted by or on behalf of Cooper or dealers selling Cooper tires.

Clearly Cooper's records of tires suffering from the same problem as the subject tire – tread separation – are relevant to the Plaintiff's claims. The arguments for the relevance of the documents in this request are similar to the arguments discussed above, for example in request number 1 for documents relating to tread separations.

**10. All depositions of Cooper employees taken in previous tread belt separation cases, including but not limited to:**

- <u>Ivan Toe, et al. v. Cooper Tire & Rubber Co., et al.</u>, in the Iowa District Court of Polk County;

- <u>Peterson et al. v. Daimler Chrysler Corp., et al.</u>, United States District Court, Northern Division of Utah, Case No. 1:06-CV-00108TC

- <u>Logan v. Cooper Tire & Rubber Co.</u>, United States District Court for the Eastern District of Kentucky, Lexington Division, Case No. 5:10-CV-00003-KSF

- <u>Hervey, et al. v. Cooper Tire & Rubber Co.</u>, United States District Court, Eastern District of Arkansas, Eastern Division, Case No. 2:99CV00212GH;

- <u>Castro-Barreto v. Cooper Tire & Rubber Co.</u>, Superior Court of Los Angeles County, California, Case No. BC 254965;

- <u>Coleman v. Cooper Tire & Rubber Co.</u>, United States District Court, Southern District of Georgia, Brunswick Division, Civil Action No. CV202-036;

- <u>Middleton, etc. v. Cooper Tire & Rubber Co.</u>, Court of Common Pleas, Hampton County, South Carolina, Case No. 99-CP-25-214;

- <u>Smalls v. Cooper Tire & Rubber Co.</u>, 9th Judicial Circuit Court, Charleston County,

**South Carolina**

The plaintiff seeks the testimony requested because the defects in the tires at issue in these related law suits bear a remarkable resemblance to the defects in the tire in the case at bar.  See Cottles Aff. ¶ 9:

> "In other Cooper cases, including Rodriguez, Toe, Petersen and Logan, I have been
> furnished with a great many internal Cooper documents, including specifications, design
> drawings, and internal studies and communications.  I have also read protected sworn
> depositions of Cooper employees including the California JCCP depositions, Toe depositions,
> Toe trial testimony, and depositions in the cases referenced above.  I am unable to provide the
> Court with a detailed explanation of the information found within the documents and
> depositions I have reviewed in other Cooper cases due to the restrictive nature of the protective
> orders entered in each of those cases. However, I can swear to the fact that the Cooper tire in
> Moss and each of the other Cooper tire tread belt separation cases in which I have been a
> consultant are substantially similar in design and construction.  Moreover, the same design
> defects which caused the tread separation failure in all those previous cases are the identical
> defect in the case at hand.  The defect, which is thoroughly discussed in the information
> Plaintiff now seeks, concerns the catastrophic failure of Cooper tires as the result of belt-to-belt
> separation.  Hence, the mode and mechanism of failure is the same in all of these tires.
> Moreover, Cooper is aware, based on its internal correspondence, that the mode and mechanism
> of failure is the same across its tires lines and brands."

The transcripts requested are, therefore, as discussed above, clearly relevant to the Plaintiff's claims.

The Defendant has objected to the discovery of transcripts and exhibits from depositions taken under a protective order in prior litigation.  Cooper's primary argument in resisting discovery is based on the idea of "comity" and relies on Keene Corp. v. Caldwell, 840 S.W.2d 715 (Tex. App. -Houston

[14th Dist.] 1992).  In <u>Keene,</u> a request for production sought access to certain depositions taken in an earlier action brought by Keene against its own insurance carrier, INA, in federal court.  Of the thirty-three depositions sought, Keene produced all but three.  The depositions not produced were not depositions of Keene employees.  Instead, the three depositions in question were those of employees of the insurance carrier who was a party in the federal suit, but not a party in the new action.  The court sustained the objection to production applying the concepts of comity and noted that the deposition of a non-party taken under a protective order should be afforded the protection of the order, not as a matter of obligation, but out of deference and respect.

Certainly the Defendant does not claim that all documents, once produced under a protective order, are thereafter immune from production.  Therefore, at least the exhibits of prior depositions described in this request should be subject to discovery in this case.  Additionally, depositions from prior litigation may be ordered produced, at the discretion of the court, even though they were initially provided under a protective order.  In <u>Melea Ltd. v. C.I.R.,</u> 118 T.C. 218 (U.S. Tax Court 2002), the court presided over a discovery dispute in which the Commissioner of Internal Revenue sought to compel production of deposition transcripts taken in a prior patent suit in which the taxpayer had been a defendant.  The court adopted a four-part balancing test considering: (1) whether the protective order in the prior litigation was issued by a court as resolution of a controversy or was merely an agreement of the parties, (2) whether the deposition is from a person originally entitled to access the information within it, (3) whether the original case is still pending and the potential burden or expense that would be incurred to seek modification of the order, and (4), whether the court could continue the protections of the prior litigation through its own protective order.  <u>Id.</u> at 223-226, <u>citing</u> <u>Tucker v. Ohtsu Tire & Rubber Co.,</u> 191 F.R.D. 495, 499-500 (D. Md. 2000).  After considering the factors in that case the court compelled the production of the deposition transcripts under a protective order.

Applying the four <u>Melea</u> factors to the facts in this case, the court should order the production

21

of the transcripts. Most importantly, the transcripts sought are all for the depositions of Cooper employees, and any protected information is Cooper's own information which would be subject to the continuing protective order already in place. Additionally, many of the cases from which depositions are sought have long since closed and the Plaintiff in this case had no timely opportunity to intervene. It would require significant time and expense for the Plaintiff to now intervene in each case and seek modifications of each protective order.

## V. Conclusion:

In accordance with the authority cited above, and based on the facts and claims of the Plaintiff addressed herein, the Plaintiff respectfully requests that this Court enter an Order requiring the Defendant, Cooper tire to produced the documents requested which they have thus far withheld.

Thank you for the attention you have devoted to this litigation.

Respectfully submitted,

**LEVINSON AXELROD, PA**
Attorneys for Plaintiff

/s/
Andrew D. Nebenzahl, BBO# 368065
Smith Lee Nebenzahl, LLP
One Post Office Square
Sharon, MA 02067
(781) 784-2000
Ronald B. Grayzel
Levinson Plaza
2 Lincoln Highway
Edison, New Jersey 08818-2905
732-494-2727

Dated: _____

22

GEORGE MOSS V. COOPER TIRE & RUBBER COMPANY

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

Civil Action No.:  3:11-CV-00689-FLW-LHG

# PLAINTIFF'S EXHIBIT B

October 12, 2012

Andrew D. Nebenzahl, BBO# 368065
Smith Lee Nebenzahl, LLP
One Post Office Square
Sharon, MA 02067
(781) 784-2000

**RE:   Moss v. Cooper Tire & Rubber Co.**
      <u>**Civil Action #: 3:11-cv- 00689**</u>

Dear Mr. Nebenzahl:

We have reviewed and attempted to respond to your draft supplemental letter to Judge Goodman. We are unable to respond to many of your arguments, however, without repeating what we have already provided in the previous joint submission. Much of your draft supplemental letter rehashes the very arguments we have already briefed. We are concerned that this is not what the Court has requested or is expecting from the parties. Judge Goodman specifically requested that we "please don't repeat what you've already given me," but rather "drill down to the next level." *See* Transcript of September 18, 2012 hearing at p. 13. Please identify the new arguments you are making so that we can respond accordingly.

In addition, please advise as to whether you plan to provide any additional evidence from Mr. Cottles. Judge Goodman asked the parties to provide engineering perspective what is or is not a substantially similar product for purposes of discovery. You have not provided any new arguments from your expert that I can see. Cooper is in the process of obtaining an additional affidavit from Mr. Brinkman, but needs to know whether you will put forth any additional evidence from Mr. Cottles so that we can respond to it.

Lastly, we ask that you formally serve Cooper with your "revised requests for production," so Cooper may respond in accordance with the procedures and limits set forth in the Federal Rules of

1

Civil Procedure. We appreciate your attempt to clarify the information you desire by category, rather than individual document by bates numbers from other cases, as suggested by the Court. We therefore provide below an indication of how Cooper will likely respond to your revised discovery requests and for purposes of discussion next week regarding the scopes of discovery for such requests. However, we reserve all formal objections and responses.

**Revised requests for production**

**1. Any and all documents relating or referring to tread separation of Cooper passenger and light truck steel belted radial tires, regardless of the facility at which they were manufactured.**

**Cooper's Argument in Response:**

Cooper will respond to this revised discovery request once it is formally served upon Cooper, but provides the following argument and offer of compromise for Plaintiff's consideration.

This request is undeniably overbroad given that since 1992, Cooper has manufactured more than 600 million tires to more than 2,200 different designs (green tire specifications, or "GTS"es) at its four manufacturing plants. Plaintiff cannot possibly be arguing that discovery of every tire manufactured by Cooper since 1992 is relevant to the alleged failure of the Moss tire. Neither this request, nor the latest information from Plaintiff, attempts to define which tires Plaintiff believes, from an engineering perspective, are similar to the subject tire for purposes of discovery. Furthermore, the lack of any time constraint in this request makes responding virtually impossible. For example, one of Plaintiff's main arguments made to the Court was that all tires manufactured with the same skim stock are defective in design. The subject tire was manufactured with skim stock 525D, which went into effect in 2000. Tires manufactured prior to 2000, based on Plaintiff's own arguments, would be "dissimilar" and therefore not discoverable.

Cooper continually seeks to improve the quality of its products and as part of its continuous

2

improvement process, Cooper regularly implements and utilizes new policies, procedures, methods and/or materials with the aim, either directly or indirectly, of improving the durability of its tires. In fact, Cooper's research and development expenditures exceeded $150 million in the last four years alone. Like any technology-driven company, Cooper has generated multitudes of documents discussing changes to the design and manufacturing process that could potentially improve the durability of its product. Many of these documents may arguably "relate or refer to tread separation," but are likely to be completely irrelevant to the Moss tire or its alleged failure.

 Cooper has already produced consumer complaint files alleging tread separations of GTS 5237 tires from two years before through one year after the date the Subject Tire was manufactured, separation-related adjustment data for tires manufactured to GTS 5237 for the entire time period they were manufactured, adjustment exception reports and adjustment follow-up reports applicable to GTS 5237 tires from two years before through two years after the Moss tire's manufacture, quarterly adjustment reports generated over an 8-year time period, and a myriad of documents relating to Cooper's efforts to improve various durability-related aspects of its tires. Cooper believes it has already produced most, if not all, of the responsive and relevant information related to this case.

 Nonetheless, in the spirit of cooperation and even though such information is not relevant to facts, circumstances and issues in this case, Cooper is willing to expand the scope of discovery, for purposes of this request to include separation-related adjustment data within the same time frame as the separation-related adjustment data for GTS 5237 that Cooper has already produced for tires manufactured to other GTSes that are the same size and the same load range as the Moss tire and are constructed with certain similar components. Cooper is currently searching for such expanded GTSes.

 **2. Any and all documents relating to the skim stock used in the subject tire, described by Cooper as skim stock 525D. This includes but is not limited to the ingredients and formula of 525D, any and all documents relating or referring to the development of 525D, any programs or**

studies involving modifications to prior skim stocks to arrive at the formulation of 525D,  and any and all documents, studies, reports, or programs involving the performance, improvements, problems, and/or costs of 525D or comparisons to previous Cooper skim stocks, including 525C. This also includes but is not limited to any and all documents which were relied upon by Cooper when developing 525D.

<u>Cooper's Argument in Response:</u>

Cooper will respond to this revised discovery request once it is formally served upon Cooper, but provides the following argument and offer of compromise for Plaintiff's consideration.[1] Cooper takes this opportunity to remind Plaintiff that your expert, Mr. Cottles has testified in prior lawsuits, including the *Toe v. Cooper Tire* case, that those tires were defective because they did not contain skim stock 525D.

Cooper has already produced specifically requested documents generated by the Tire Durability Team, some of which discuss Cooper's skim stock compound, and at least 37 pages of information pertaining to the development and implementation of skim stock 525D.

In the spirit of cooperation and even though such information is not relevant to facts, circumstances and issues in this case, Cooper is willing to produce additional test programs, product change notifications, and adjustment follow-up reports related to the implementation of skim stock 525D.

**3.  Any and all documents referring or relating to the composition of the inner liner used in the subject tire and to the manufacture and assembly of the inner liner itself.  This includes but is not limited to any and all documents referring or relating to the adoption of the inner liner**

---

[1] Cooper explained in the original joint submission that certain trade secret information is not discoverable unless and until plaintiff satisfies a heightened burden of proof, which plaintiff has not done. Cooper's rubber formulas are core trade secrets and extremely valuable to Cooper and plaintiff has not shown that this information is both relevant and necessary to the presentation of plaintiff's case.

4

compound, 4193, used in the subject tire, its ingredients, including halobutyl content, as well as studies, reports, or other internal discussions relating to the inner liner compound 4193.

**Cooper's Argument in Response:**

Cooper will respond to this revised discovery request once it is formally served upon Cooper, but provides the following argument and offer of compromise for Plaintiff's consideration.[2]

Cooper has already produced specifically requested documents generated by the Tire Durability Team, some of which discuss Cooper's innerliner compounds, and a memorandum from an innerliner study, at CCMoss_G0001896- CCMoss_G0001915.

In the spirit of cooperation and even though such information is not relevant to facts, circumstances and issues in this case, Cooper is willing to produce additional test programs, product change notifications, and adjustment follow-up reports related to the implementation of innerliner compound 4193.

**4. Any and all documents referring or relating to the "antioxidant package" or "antidegradant" used in the skim stock for the subject tire. This includes but is not limited to any and all documents referring or relating to the adoption of the antioxidant or antidegradant package used in the subject tire, as well as the ingredients and formula of that package.**

**Cooper's Argument in Response:**

Cooper will respond to this revised discovery request once it is formally served upon Cooper, but provides the following argument and offer of compromise for Plaintiff's consideration.[3]

Cooper has already produced specifically requested documents generated by the Tire Durability Team, some of which discuss Cooper's skim stock compound, and memoranda from antidegradant evaluations, at CCMoss_G0001888- CCMoss_G0001895.

---

[2] See Footnote No. 1.
[3] See Footnote No. 1.

In the spirit of cooperation and even though such information is not relevant to facts, circumstances and issues in this case, Cooper is willing to produce additional test programs, product change notifications, and adjustment follow-up reports related to the implementation of skim stock 525D.

**5. Any and all documents referring or relating to adjustment data or any other kind of record related to adjustments for any Cooper passenger or light truck steel belted radial tire which shares either the skim stock, antioxidant package, or inner liner compound with the subject tire.**

## Cooper's Argument in Response:

Cooper will respond to this revised discovery request once it is formally served upon Cooper, but provides the following argument and offer of compromise for Plaintiff's consideration.

Cooper has already produced separation-related adjustment data for tires manufactured to GTS 5237 for the entire time period they were manufactured, adjustment exception reports and adjustment follow-up reports applicable to GTS 5237 tires from two years before through two years after the Moss tire's manufacture, quarterly adjustment reports generated over an 8-year time period, and a myriad of documents relating to Cooper's efforts to improve various durability-related aspects of its tires. Cooper believes it has already produced most, if not all, of the responsive and relevant information related to this case.

In the spirit of cooperation and even though such information is not relevant to facts, circumstances and issues in this case, Cooper is willing to expand the scope of discovery, for purposes of this request to include separation-related adjustment data within the same time frame as the separation-related adjustment data for GTS 5237 that Cooper has already produced for tires manufactured to other GTSes that are the same size and the same load range as the Moss tire and are constructed with certain similar components. Cooper is currently searching for such expanded GTSes.

6

**6. Any and all documents relating or referring to the use of the belt wedges or, as it is sometimes called by Cooper, "belt edge gum strips," or BEGS. This includes but is not limited to any and all documents referring or relating to the use of BEGS by other tire manufacturers, as well as documents, comparisons, reports, or programs referring or relating to the actual or potential introduction or removal of BEGS to or from any Cooper tire, including documents related to the costs, effectiveness, durability, and reliability. This also includes but is not limited to all research viewed by Cooper employees when considering the potential introduction or removal of BEGS from any Cooper tire, including but not limited to documents obtained from consultants and information generated by other manufacturers but considered by Cooper.**

**Cooper's Argument in Response:**

Cooper will respond to this revised discovery request once it is formally served upon Cooper, but provides the following argument and offer of compromise for Plaintiff's consideration.

Cooper has already produced specifically requested documents generated by the Tire Durability Team, some of which discuss the use of belt edge gum strips, and at least 10 pages of information specifically pertaining to Cooper's use of belt edge gum strips.

In the spirit of cooperation and even though such information is not relevant to facts, circumstances and issues in this case, Cooper is willing to produce additional test programs, product change notifications, and adjustment follow-up reports related to the use of belt edge gum strips in light truck tires that were generated from two years before through two years after the Subject Tire's manufacture.

**7. Any and all documents relating or referring to the use of nylon cap plies, or, as sometimes described by Cooper, "spiral nylon over wrap," or SNOW. This includes but is not limited to any and all documents referring or relating to the use of SNOW by other tire manufacturers, as well as documents, comparisons, reports, or programs referring or relating to**

7

**the actual or potential introduction or removal of SNOW to or from any Cooper tire, including documents related to the costs, effectiveness, durability, and reliability. This also includes but is not limited to all research viewed by Cooper employees when considering the potential introduction or removal of SNOW from any Cooper tire, including but not limited to documents obtained from consultants and information generated by other manufacturers but considered by Cooper.**

**Cooper's Argument in Response:**

Cooper will respond to this revised discovery request once it is formally served upon Cooper, but provides the following argument and offer of compromise for Plaintiff's consideration.

Cooper has already produced specifically requested documents generated by the Tire Durability Team, some of which discuss the use of nylon, and at least 29 pages of information specifically pertaining to Cooper's use of nylon.

In the spirit of cooperation and even though such information is not relevant to facts, circumstances and issues in this case, Cooper is willing to produce additional test programs, product change notifications, and adjustment follow-up reports related to the use of nylon in light truck tires that were generated from two years before through two years after the Subject Tire's manufacture.

**8. Any and all documents relating or referring to the expected lifespan of the Courser Mastercraft tire, including but not limited to all documents, including both internal Cooper documents or memorandums, publicity or promotional material, or warnings to consumers or customers, that relate or refer to the number of years the tire is expected to last, the length of the warranty for the tire, the number of miles the tire is expected cover, or the amount of tread depth the tire is expected to retain at any point in its lifespan.**

**Cooper's Argument in Response:**

Cooper will respond to this revised discovery request once it is formally served upon Cooper,

but provides the following argument and offer of compromise for Plaintiff's consideration.

Subject to and without waiving its objections, Cooper states that the service life of a tire depends on many different factors, including storage conditions, the maintenance history of the tire, the conditions under which it is driven (e.g., load, speed, inflation pressure, impacts, and road hazard damage) and the habits of the driver as to acceleration, braking, and turning.  Cooper recommends that all tires are regularly inspected and removed from use based on treadwear (2/32nds of an inch) and evidence of damage (bulges, cracks, cuts, penetrations, and abnormal tire wear).

Cooper has already produced the warranty for the Moss tire, at CNCMoss_G0000386 – CNCMoss_G0000403.  Cooper will also produce Service Bulletin 112, which discusses the expected service life for passenger and light truck tires.

**9. Any and all documents relating or referring to Cooper passenger or light truck steel belted radial tires that have been returned due to tread separation, whether that designation was made by the dealer or by a Cooper representative, including but not limited to analysis, data, records or photographs from any physical examination conducted by or on behalf of Cooper or dealers selling Cooper tires.**

**Cooper's Argument in Response:**

Cooper will respond to this revised discovery request once it is formally served upon Cooper, but provides the following argument and offer of compromise for Plaintiff's consideration.

Cooper has already produced consumer complaint files alleging tread separations of GTS 5237 tires from two years before through one year after the date the Subject Tire was manufactured, separation-related adjustment data for tires manufactured to GTS 5237 for the entire time period they were manufactured, adjustment exception reports and adjustment follow-up reports applicable to GTS 5237 tires from two years before through two years after the Moss tire's manufacture, quarterly adjustment reports generated over an 8-year time period, and a myriad of documents relating to

9

Cooper's efforts to improve various durability-related aspects of its tires. Cooper believes it has already produced most, if not all, of the responsive and relevant information related to this case.

Nonetheless, in the spirit of cooperation and even though such information is not relevant to facts, circumstances and issues in this case, Cooper is willing to expand the scope of discovery, for purposes of this request to include consumer complaint files alleging tread separations and separation-related adjustment data within the same time frame as the separation-related adjustment data for GTS 5237 that Cooper has already produced for tires manufactured to other GTSes that are the same size and the same load range as the Moss tire and are constructed with certain similar components. Cooper is currently searching for such expanded GTSes.

**10. All depositions of Cooper employees taken in previous tread belt separation cases, including but not limited to:**

- **Ivan Toe, et al. v. Cooper Tire & Rubber Co., et al., in the Iowa District Court of Polk County;**

- **Peterson et al. v. Daimler Chrysler Corp., et al., United States District Court, Northern Division of Utah, Case No. 1:06-CV-00108TC**

- **Logan v. Cooper Tire & Rubber Co., United States District Court for the Eastern District of Kentucky, Lexington Division, Case No. 5:10-CV-00003-KSF**

- **Hervey, et al. v. Cooper Tire & Rubber Co., United States District Court, Eastern District of Arkansas, Eastern Division, Case No. 2:99CV00212GH;**

- **Castro-Barreto v. Cooper Tire & Rubber Co., Superior Court of Los Angeles County, California, Case No. BC 254965;**

- **Coleman v. Cooper Tire & Rubber Co., United States District Court, Southern District of Georgia, Brunswick Division, Civil Action No. CV202-036;**

10

- **Middleton, etc. v. Cooper Tire & Rubber Co.,** Court of Common Pleas, Hampton County, South Carolina, Case No. 99-CP-25-214;

- **Smalls v. Cooper Tire & Rubber Co.,** 9th Judicial Circuit Court, Charleston County, South Carolina

**Cooper's Argument in Response:**

Cooper will respond to this revised discovery request once it is formally served upon Cooper, but provides the following argument for Plaintiff's consideration.

Mr. Cottles states that he has seen documents produced by Cooper in the Rodriguez, Toe, Petersen and Logan cases and believes that the tires in those cases bear "a remarkable resemblance" to the alleged defects in the tire in this case and that "the mode and mechanism of failure is the same in all of these tires." See Cottles Aff. ¶ 9. Mr. Cottles does not explain, however, why the tires were similar. Tread separations do not make tires similar. As Courts have repeatedly held, and as previously briefed to the Court, tread separations more often are the result of service conditions, including abuse. In this case, the subject tire had two unrepaired punctures and flat fixer in it. Do the other tires to which Mr. Cottles refer have punctures and flat fixer?

Mr. Brinkman has already provided a detailed affidavit contrasting the designs of the Toe, Hervey, Castro-Baretto, Coleman, Middleton, Smalls tires to the design of the Moss tire. All six of these tires contained a different skim stock than the Moss tire, a different innerliner compound than the Moss tire, and completely different tread measurements than the Moss tire. Thus, these tires lack the same skim stock and innerliner, which are the very components on one hand Plaintiffs claimed to the Court made tires similar and justified discovery all Cooper tires with the same skim stock and innerliner. Further, all but the Toe tire contained a different belt construction. In his supplemental affidavit, Mr. Brinkman will explain the correlation of these technical differences, along with other factors, to the occurrence of a tread separation. Mr. Brinkman will further explain why the alleged

11

failures of these tires, most of which were manufactured several years before the <u>Moss</u> tire, are completely unrelated and irrelevant to the alleged failure of the <u>Moss</u> tire.

Plaintiffs have now asked for depositions of Cooper's employees taken in the <u>Petersen</u> and <u>Logan</u> cases. Mr. Brinkman's supplemental affidavit will also identify in detail why the <u>Petersen</u> and <u>Logan</u> tires are different from the <u>Moss</u> tire in both design and application and why the alleged failures of the <u>Petersen</u> and <u>Logan</u> tires have no bearing on the alleged failure of the <u>Moss</u> tire.

Respectfully submitted,

Dated: _____

GEORGE MOSS V. COOPER TIRE & RUBBER COMPANY

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

Civil Action No.:  3:11-CV-00689-FLW-LHG

# PLAINTIFF'S EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| GEORGE MOSS | ) | Civil Action |
| | ) | |
| Plaintiff, | ) | No.: 3:11-CV-00689-FLW-LHG |
| | ) | |
| v. | ) | |
| | ) | |
| COOPER TIRE & RUBBER COMPANY | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

## PLAINTIFF'S REQUESTS FOR PRODUCTION

At the request of the Court, following a hearing on September 18, 2012, the Plaintiff submits this additional request for production.

## DEFINITIONS

Throughout these requests, the following terms and/or abbreviations shall have the following meanings:

1.     "Document" shall be construed to mean all writings and other printed matter of every kind, including, but not limited to, books, records, manuals, statements, minutes, letters, correspondence, memorandum reports, lists, studies, surveys, directives, agreements, contracts, print-outs, telegrams, teletype, telexes, telefax, pamphlets, notes, messages, bulletins, e-mail, diary and calendar entries, maps, charts, brochures, graphics, tabulations, press releases, address books, ledgers, invoices, bills, work sheets, trip reports, receipts, returns, prospectuses, financial statements, tax returns, schedules, affidavits, applications, resumes, canceled checks,

checkbooks, check stubs, check ledgers, transcripts, statistics, magazine or newspaper articles or

advertisements, releases, test reports and records of meetings, conferences, telephone

conversations or other conversation or communication (including any and all drafts, alterations,

modifications, changes and amendments of any of the foregoing) in the possession, custody or

control of the Defendant responding to this discovery.  The term "document" or "documents

shall also include non-printed matter such as voice records and reproductions, film impressions,

photographs, negatives, slides, microfilms, microfiches, e-mail, and other things that document

or record ideas, words or impressions.  The term "document" or "documents" further includes all

punch cards, tapes, disks, or records used in electronic data processing, together with the

programming instructions and other written material necessary to understand or use such punch

cards, tapes, disks or other recordings, and further includes data or data compilation in electronic

or other form that can be printed through proper programming or decoding of the electronic or

mechanical data storage facility.

     2.     "Hazard" shall be construed to mean any condition or any changing set of

circumstances, which presents an injury potential.  The defendant's response to an inquiry

employing this term shall not be deemed to constitute an admission that said hazard does in fact

exist.

     3.     "Incident" shall be construed to mean the incident that occurred on the date and

occasion set forth in the plaintiff's complaint.  The details of the occasion of the incident are

more fully set forth in the plaintiff's complaint.

4.      "Information" shall be construed to refer to both facts and applicable principles; this word should not be construed to be limited by any method of acquisition or compilation and should, therefore, be construed to include oral and electronic information as well as documents.

5.      "Other Incidents, Other Similar Incidents" shall be construed to mean any other incident the occurrence of which involves a similar failure mode or a similar hazard as that alleged to bé involved in the occurrence of the incident; either of these phrases should include the occurrence of such other incidents, which has resulted in a report or complaint, or notification, by whatever name called, in which it is stated or alleged that the occurrence of such other incident resulted from a similar failure mode or similar hazard as that alleged in the present incident.

6.      "Predictive Analysis" shall be construed to mean the variety of techniques including those referred to by members of the Systems Safety Profession and reliability engineers as a "Fault Tree Analysis" and an "Effect Analysis" and other techniques and procedures which assist in hazard identification and/or hazard prevention or control.

7.      "Product or Products" and/ or "The Subject Tire" shall be construed to mean the specific steal belted radial tire that is the subject of the Plaintiff's complaint in this litigation.

8.      "Similar Product" or "Similar Products" shall be construed as it was by Judge Farmer of the District Court of Appeal of the State of Florida, Fourth District in Alvarez v. Cooper Tire & Rubber Company  No. 4D08-3498 on December 1, 2010 to mean any and all steel belted radial tires which have been designed, manufactured and/or sold by Defendant regardless of model or Green Tire Specification in the past 15 years.

3

9.     "Quality Assurance" shall be construed to mean any and all efforts (including, but not limited to, studies, test, inspections, examination) and other activities conducted by or on behalf of the defendants for the purpose of ascertaining whether or not a finished product conforms to the design objective or design criteria for that product.

10.     "Study, Studies" shall be construed to mean any study made by or on behalf of the defendant or a study made by some other person, firm or corporation to which the defendant referred in selecting the design that was adopted by the defendant for a product (or any subsequent change thereto) or in the course of the investigation of the "incident". The word study includes marketing analysis, "predictive analysis", "tests", engineering analysis of "hazards" and "benefits", "cost/benefits" analysis, "quality assurance" analysis, documentation of or summaries or analysis of "other similar incidents".

11.     "Test(s)" shall be construed to mean any test made by or on behalf of the defendant or test(s) made by some other person, firm or corporation to which the defendant referred in selecting the design that was adopted by the defendant for a product (or any subsequent change thereto), or in the course of the investigation of said incident. The word test(s) includes static and dynamic tests, whether involving models or full size components; the word test(s) includes computer-simulated dynamic and static testing.

12.     "Tread separation" shall be construed to mean any one or more of the following: tread separation, tread-belt separation, belt edge separation and/or blowout.

13.     "Belt(s)" shall be construed in the manner normally used in the steel-belted tire industry.

4

14.     "Cord(s)" shall be construed as it is defined in 49 C.F.R. §571.109, means the strands forming the plies in the tire.

15.     "Nylon overlays" shall be construed to include but not be limited to: nylon overwraps, nylon overlays, nylon cap plies, nylon cap strips or similar construction.

16.     "Ply" shall be construed as it is defined in 49 C.F.R. §471.109, means a layer of rubber-coated parallel "cords".

17.     "Defendant", "you" and "your" shall be construed to mean the respective Defendant responding to this discovery, its merged, consolidated, or acquired predecessors, its successors, its subsidiaries, divisions, operating units, and other business entities which are owned in whole or in part by the Defendant.  These terms also include any parent corporations or holding companies with which the Defendant is associated.  Finally, these terms include present and former officers, directors and all other persons acting or purporting to act on behalf of the Defendant.

18.     "Tread" shall be construed as defined in 49 C.F.R. §571.109, means that portion of the tire that comes into contact with the road.

## REQUEST FOR DOCUMENTS

**REQUEST NO. 185**
Any and all documents relating or referring to tread separation of Cooper passenger and light truck steel belted radial tires, regardless of the facility at which they were manufactured.

**REQUEST NO. 186**
Any and all documents relating to the skim stock used in the subject tire, described by Cooper as skim stock 525D, including but not limited to the following:

    (a) the ingredients and formula of 525D;

    (b) any and all documents relating or referring to the development of 525D;

(c) any programs or studies involving modifications to prior skim stocks to arrive at the formulation of 525D;

(d) and any and all documents, studies, reports, or programs involving the performance, improvements, problems, and/or costs of 525D or comparisons to previous Cooper skim stocks, including 525C;

(e) any and all documents which were relied upon by Cooper when developing 525D.

## REQUEST NO. 187
Any and all documents referring or relating to the composition of the inner liner used in the subject tire and to the manufacture and assembly of the inner liner itself, including but not limited to any and all documents referring or relating to the adoption of the inner liner compound, 4193, used in the subject tire, its ingredients, including halobutyl content, as well as studies, reports, or other internal discussions relating to the inner liner compound 4193.

## REQUEST NO. 188
Any and all documents referring or relating to the "antioxidant package" or "antidegradant" used in the skim stock for the subject tire, including but not limited to any and all documents referring or relating to the adoption of the antioxidant or antidegradant package used in the subject tire, as well as the ingredients and formula of that package.

## REQUEST NO. 189
Any and all documents referring or relating to adjustment data or any other kind of record related to adjustments for any Cooper passenger or light truck steel belted radial tire which shares either the skim stock, antioxidant package, or inner liner compound with the subject tire.

## REQUEST NO. 190
Any and all documents relating or referring to the use of the belt wedges or, as it is sometimes called by Cooper, "belt edge gum strips," or BEGS, including but not limited to the following:

(a) any and all documents referring or relating to the use of BEGS by other tire manufacturers;

(b) documents, comparisons, reports, or programs referring or relating to the actual or potential introduction or removal of BEGS to or from any Cooper tire, including documents related to the costs, effectiveness, durability, and reliability;

(c) all research viewed by Cooper employees when considering the potential introduction or removal of BEGS from any Cooper tire, including but not limited to documents obtained from consultants and information generated by other manufacturers but considered by Cooper.

## 191 REQUEST NO. 191
Any and all documents relating or referring to the use of nylon cap plies, or, as sometimes described by Cooper, "spiral nylon over wrap," or SNOW, including but not limited to the following:

6

(a) any and all documents referring or relating to the use of SNOW by other tire manufacturers;

(b) any and all documents, comparisons, reports, or programs referring or relating to the actual or potential introduction or removal of SNOW to or from any Cooper tire, including documents related to the costs, effectiveness, durability, and reliability;

(c) all research viewed by Cooper employees when considering the potential introduction or removal of SNOW from any Cooper tire, including but not limited to documents obtained from consultants and information generated by other manufacturers but considered by Cooper.

## REQUEST NO. 192

Any and all documents relating or referring to the expected lifespan of the Courser Mastercraft tire, including but not limited to all documents, including both internal Cooper documents or memorandums, publicity or promotional material, or warnings to consumers or customers, that relate or refer to the number of years the tire is expected to last, the length of the warranty for the tire, the number of miles the tire is expected cover, or the amount of tread depth the tire is expected to retain at any point in its lifespan.

## REQUEST NO. 193

Any and all documents relating or referring to Cooper passenger or light truck steel belted radial tires that have been returned due to tread separation, whether that designation was made by the dealer or by a Cooper representative, including but not limited to analysis, data, records or photographs from any physical examination conducted by or on behalf of Cooper or dealers selling Cooper tires.

## REQUEST NO. 194

All depositions of Cooper employees taken in previous tread belt separation cases, including but not limited to the following:

1. Ivan Toe, et al. v. Cooper Tire & Rubber Co., et al., in the Iowa District Court of Polk County;
2. Peterson et al. v. Daimler Chrysler Corp., et al., United States District Court, Northern Division of Utah, Case No. 1:06-CV-00108TC
3. Logan v. Cooper Tire & Rubber Co., United States District Court for the Eastern District of Kentucky, Lexington Division, Case No. 5:10-CV-00003-KSF
4. Hervey, et al. v. Cooper Tire & Rubber Co., United States District Court, Eastern District of Arkansas, Eastern Division, Case No. 2:99CV00212GH;
5. Castro-Barreto v. Cooper Tire & Rubber Co., Superior Court of Los Angeles County, California, Case No. BC 254965;
6. Coleman v. Cooper Tire & Rubber Co., United States District Court, Southern District of Georgia, Brunswick Division, Civil Action No. CV202-036;
7. Middleton, etc. v. Cooper Tire & Rubber Co., Court of Common Pleas, Hampton County, South Carolina, Case No. 99-CP-25-214;
8. Smalls v. Cooper Tire & Rubber Co., 9th Judicial Circuit Court, Charleston County, South Carolina

LEVINSON AXELROD, PA
Attorneys for Plaintiff


_____
Andrew D. Nebenzahl, BBO# 368065
Smith Lee Nebenzahl, LLP
One Post Office Square
Sharon, MA 02067
(781) 784-2000
Ronald B. Grayzel
Levinson Plaza
2 Lincoln Highway
Edison, New Jersey 08818-2905
732-494-2727

Dated: _____